1

2

3

4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

5

6

DOCKLIGHT BRANDS INC,

7

       Plaintiff-Counterclaim Defendant,

CASE NO. 2:21-cv-01692-TL-BAT

8

   v.

**REPORT AND
RECOMMENDATION**

9

10

TILRAY INC. and HIGH PARK
HOLDINGS LTD,

11

     Defendants-Counterclaimants.

12

     Docklight Brands Inc. ("Docklight"), Plaintiff and Counterclaim Defendant moves to

13

dismiss the Counterclaims, Affirmative Defenses, and to Strike Portions of Answer of

14

Defendants and Counterclaimants Tilray, Inc. ("Tilray") and High Park Holdings Ltd. ("High

15

Park") (collectively, "Defendants"). Dkt. 18. Docklight also filed a request for judicial notice.

16

Dkt. 19. Defendants filed a response and request for judicial notice. Dkts. 25 and 26,

17

respectively. Docklight filed a second request for judicial notice (Dkt. 29) and a reply (Dkt. 30).

18

     Having carefully reviewed the parties' briefing and balance of the record, the

19

undersigned recommends that the motion be granted in part and denied in part as detailed herein.

20

BACKGROUND

21

     Docklight and Defendant High Park were parties to a license agreement ("License")

22

under which High Park produced, sold, and distributed Bob Marley-branded cannabis products in

23

Canada, in exchange for royalty payments to Docklight. Defendant Tilray owns and controls

High Park. Central to this lawsuit and this motion are two amendments to the License made by

REPORT AND RECOMMENDATION - 1

Docklight and High Park. On December 3, 2020, Docklight and High Park amended the License to, among other things: (1) obligate High Park to make a quarterly Guaranteed Minimum Royalty ("GMR") payment of CAD $625,000; and (2) grant High Park the right to terminate the License for convenience in exchange for High Park's payment to Docklight of CAD $1.5 million (the "First Amendment").

On April 30, 2021, Docklight and High Park amended the License again, this time to remove High Park's termination-for-convenience right, in exchange for Docklight's agreement not to exercise its right to terminate when High Park's parent Tilray merged with its competitor Aphria, Inc. (the "Second Amendment").

In October 2021, High Park stopped making its quarterly GMR payments. Docklight alleges that since at least that time, High Park has also been in material breach of other obligations, including its duty to permit Docklight to inspect its books and records. Docklight filed this lawsuit on November 5, 2021. Dkt. 1.

Tilray and High Park answered Docklight's Complaint and asserted a number of Counterclaims. Dkt. 10. Docklight moved to dismiss the Counterclaims under Rule 12(b)(6) and moved for a more definite statement of Defendants' affirmative defenses and certain portions of their Answer. Dkt. 12. Defendants responded by filing an Amended Answer, Affirmative Defenses, and Counterclaims. Dkt. 15.

Docklight argues that Defendants' amendments do nothing to cure the fatal defects in their original filing and that their Counterclaims should be dismissed without leave to amend, and the affirmative defenses and insufficient portions of the Answer stricken. Dkt. 18.

<u>RELEVANT ALLEGATIONS</u>

A.    <u>The License</u>

1      1.      The Initial License

In February 2018, Docklight entered into a license agreement under which High Park was

granted the exclusive right and obligation to manufacture, advertise, distribute, and sell certain

Marley-branded cannabis products in Canada (the "License"). Docklight and High Park entered

into the License in December 2018. Dkt. 19, Declaration of Patrick Moen, Ex. A; Dkt. 15

(Amended Answer), ¶ 10.

The License obligated High Park to, among other things, "market, advertise, promote and

sell the [Marley-branded] Products to Customers located in [Canada]" and to use "commercially

reasonable efforts to maximize sales of the [Marley-branded] Products." *Id*. ¶ 2.1(a)). It also

required High Park to furnish detailed "complete and accurate written statements" regarding the

sales of Licenses Products, and permit Docklight "to examine and copy all books and other

records of the Licensee relating the [Licensed] Products." *Id*. ¶¶ 8.3, 8.6.

The License includes a schedule setting forth royalty payments, calculated for each brand

as a percentage of its Licensed Product Net Sales, to be calculated and payable quarterly. Dkt.

19, pp. 22-24 (License Schedule). The License also provides for a "periodic adjustment"

requiring that "[t]he rate of royalty set forth [on the applicable License Schedule] shall be

reviewed annually by the parties no later than 45 days following the end of each year to ensure

that it continues to reflect the arm's-length value of the rights granted to the Licensee under the

terms of this Agreement." Dkt. 15 ¶ 61; Dkt. 19, Ex. A § 8.8.

The License also gave Docklight "the right to terminate the agreement immediately upon

written notice to Licensee" if "[t]here is a change of control of the Licensee [High Park]" as

defined therein. Dkt. 19, Ex. A § 10.2(k).

    2.    <u>First Amendment</u>

Docklight and High Park executed the First Amendment on December 3, 2020. Among other things, the First Amendment: (1) obligated High Park to make minimum quarterly GMR payments of CAD $625,000 to Docklight; (2) granted High Park a right to terminate the agreement without cause, in exchange for a one-time payment of CAD $1.5 million; and (3) obligated Docklight to keep High Park "apprised" of efforts to license the Marley brand in Canada with respect to "Other Cannabis Products" not covered under the License, and to give High Park the opportunity to match the terms of any agreement with another party respecting such new products (the "ROFO"). Dkt. 19, Moen Decl., Ex. B; Dkt. 15, ¶ 33.

    3.    <u>Second Amendment and the Tilray-Aphria Merger (the "Merger")</u>

Approximately two weeks after the First Amendment was executed, Tilray announced it was in discussions to merge with Aphria. Dkt. 15 ¶ 35. The License includes a provision allowing Docklight to terminate the agreement in the event of a such a change of control at High Park. Dkt. 19, Moen Decl., Ex. A ¶ 10.2(k). On January 28, 2021, High Park wrote to Docklight requesting that it waive that right in connection with the Merger. Dkt. 15 ¶ 38. Between February and April of 2021, the parties negotiated over Docklight's concerns regarding how the Merger would affect High Park's performance under the License. Dkt. 15 ¶¶ 38-44. On April 1, 2021 a video conference was held between representatives from Docklight, Tilray, and Aphria, including then-Aphria CEO Irwin Simon (who is now the CEO of New Tilray), during which the participants discussed the role of the Marley brand in the Tilray-Aphria portfolio and the Tilray-Aphria parties voiced their desire to continue the Marley products following the merger. *Id.* 4.16.

Docklight ultimately agreed to forego its termination right in exchange for High Park's agreement to relinquish its own termination right. *Id*. ¶ 44. The parties executed the Second

Amendment, reflecting High Park's agreement to relinquish its termination right, on April 30, 2021. *Id.*; Moen Decl., Ex. C. Tilray's General Counsel was involved in the negotiation of the Second Amendment. Dkt. 15, ¶ 4.19.

Docklight and High Park agreed that, "[e]xcept as expressly provided in this Second Amendment, all of the terms and provisions of the [original License and First Amendment] are and will remain in full force and effect and are hereby ratified and confirmed by the Parties." *Id.* At the same time, Docklight signed an express waiver of its right to terminate with respect to the Merger. Dkt. 15 ¶ 44; Dkt. 19, Moen Decl., Ex. D.

The Merger closed on May 3, 2021. Dkt. 15 ¶ 46. The surviving entity goes by the name Tilray. For ease of reference, the Court adopts Docklight's reference to Tilray as it existed before the merger as "Old Tilray", Aphria as it existed before the merger as Aphria, and the post-merger entity as "New Tilray."

B.    This Litigation

A few months after the Merger, Docklight alleges that High Park materially breached the License by, among other things, refusing to make GMR payments and refusing to permit inspection of books and records. Docklight brought this lawsuit in King County Superior Court. Dkt. 1-1.

C.    Summary of High Park's Allegations

1.    Allegations of Fraud / Fradulent Inducement/ Negligent Misrepresentation

Defendants allege that prior to Docklight and High Park entering the First Amendment, Docklight: (1) knew that Old Tilray and Aphria were "in discussions" to merge in the future; (2) knew that merger would result in Old Tilray having "new management"; (3) knew the merger would trigger Docklight's right to terminate the License; and (4) had an undisclosed plan to,

once the merger was announced, use its termination right as leverage to convince High Park to surrender the termination right it had secured under the First Amendment. Dkt. 15 ¶ 79. Defendants allege that this amounts to fraud, fraudulent inducement and/or negligent misrepresentation.

Defendants allege that Docklight entered the First Amendment intending to extract the payment of the 1.5 million and to lock High Park into an uneconomic GMR requirement ahead of the Merger. Dkt. 15 ¶ 60. On January 28, 2021—just weeks after Docklight accepted the CAD 1.5 million for High Park's right to terminate for convenience—High Park asked Docklight to confirm it waived any right to terminate the License based on a change of control related to the Merger. *Id*. ¶ 38. On February 10, 2021, Docklight's CEO Damian Marano refused to give such assurances unless High Park forfeited its just-purchased right to terminate for convenience, even though Docklight knew of the upcoming Merger when High Park purchased that right and Docklight had accepted payment in exchange for High Park's right to terminate for convenience just a few weeks before. *Id*. ¶ 39. In this same email, Marano stated that Docklight had "agreed to [High Park's right to terminate for convenience] in large part because of [Docklight's] trust and close relationship with the Tilray management team." *Id*. ¶ 40. High Park contends that this explanation was pretextual because when Docklight agreed to High Park's termination right and accepted High Park's 1.5 million payment, Docklight did so knowing of the upcoming Merger and knowledge that Aphria's CEO would manage the merged company. *Id*. Docklight supplied this information to guide the business dealings of Tilray's incoming management and knew that its representation would be conveyed to Aphria management (soon to be Tilray's management), and that this incoming Tilray management would rely on it. *Id*.

Defendants believe that Docklight never intended to terminate the License due to any change in control but that it accepted High Park's payment of CAD $1.5 million for the right to terminate for convenience—with knowledge that Aphria and Tilray were negotiating a merger and that as a result of the merger, Tilray's management would change. Id. ¶¶ 50-51.

During Tilray's discussions with Aphria regarding a potential merger, Brendan Kennedy (then Tilray's CEO and board member and at all times an owner of significant Docklight stock), Michael Blue, and Christian Groh (officers of Docklight with an ownership interest in Tilray) had a series of telephone conferences, and in connection with those phone calls Kennedy shared with Blue and Groh specific details of the Tilray-Aphria merger negotiations. Dkt. 15 ¶¶ 23, 25. Kennedy, Blue, and Groh continued to have meetings throughout the merger negotiations, and during this time, Kennedy maintained shared office space with Blue and Groh. Id. ¶¶ 6, 21, 24-27. By December 15, 2020, news of the forthcoming merger (including that Aphria's then-CEO would become Tilray's CEO) became public knowledge, and a formal announcement occurred on December 16, 2020. Id. ¶ 35.

On April 1, 2021, Marano and others at Docklight met with the incoming Tilray management team and represented that the Marley-branded products were performing well, and that the merged Tilray-Aphria could build on that success. Id. ¶ 41. Docklight management and shareholders knew that many of Docklight's products would be de-listed (and thus unsaleable), and that product revenues would not be enough to recoup the First Amendment's GMR. Id. ¶ 42.

At no time during these discussions did Docklight inform the incoming Tilray management of the upcoming de-listings, and the incoming management was unaware of same. Id. ¶ 43. Docklight also never informed incoming Tilray management that Docklight had been aware of the Merger and management details at the time the First Amendment was executed.

1    Docklight intended Tilray's incoming management to rely upon, and knew that this management
2    did rely upon, Docklight's false and incomplete statements. *Id*. ¶ 41.

3            2.      GMR and De-Listing of Products

4            In the First Amendment, High Park agreed to the addition of a Guaranteed Minimum
5    Royalty ("GMR") of CAD $625,000 quarterly, beginning in 2021. Dkt. 15, ¶ 30. Defendants
6    allege that the First Amendment therefore simultaneously decreased the number of brands High
7    Park was licensed to use and increased the economic burden on High Park because at the time
8    the parties entered into the First Amendment, Docklight knew that certain of the Licensed
9    Products, as defined in the First Amendment, would be de-listed in 2021, such that they could no
10   longer be sold in Canada, and that the GMR was thus uneconomic. *Id.*, ¶ 31.

11           Following the April 30, 2021 execution of the Second Amendment, which eliminated
12   High Park's right to terminate the License for convenience in exchange for paying Docklight the
13   CAD $1.5 million, and completion of the Merger on May 3, 2021, there was a significant decline
14   in Marley Natural revenues due to de-listing of products. Dkt. 15, ¶ 46. During the three-months
15   following the Merger, many of the Marley Natural products were de-listed from the Canadian
16   market, and thus could no longer be sold by Tilray. This de-listing materially affected revenues
17   from Marley-branded products. *Id*. ¶ 47. Defendants believe that Docklight knew prior to the
18   execution of the Second Amendment that these products were going to be de-listed after the
19   Merger and failed to disclose this to New Tilray's management team. *Id*. ¶ 48.  High Park agreed
20   to the Second Amendment both because Docklight failed to disclose the upcoming de-listings of
21   its products and in reliance on Docklight's statement that Docklight agreed to the termination
22   clause because of its trust in the Old Tilray management team, and that Docklight would not
23   waive any right to terminate for change in control absent High Park's agreement to relinquish its

right to terminate for convenience. *Id.* ¶ 49.

### 3. Notice to Docklight of Non-Economic GMR

Since mid-2021, New Tilray's management has repeatedly informed Docklight that the GMR is not economic based on actual sales. Thus, the GMR is not an "advance" of any actual royalties due and does not reflect the arm's length value of the rights granted in License. *Id.* ¶ 62. Docklight has refused to address these concerns, or to engage in the required annual review or periodic adjustment, in violation of License § 8.8. Instead, on November 5, 2021, Docklight filed this lawsuit, and on February 9, 2022—five days before the very last day to conduct this review—Docklight sent notice to High Park purporting to terminate the License, while also claiming a right to all past and future GMR payments at the rate that Docklight has refused to adjust. *Id.* ¶ 63.

### 4. High Park's Right of First Offer

By no later than early 2021, Docklight was negotiating a significant investment by Turning Point Brands, Inc. ("TPB"). *Id.* ¶ 52. On April 20, 2021, Docklight announced that TPB made an $8.7 million strategic investment in Docklight, and that this investment granted TPB an exclusive right to distribute certain Marley-branded products in the U.S. and unspecified follow-on rights. *Id.* ¶ 52. Also, in April 2021, TPB subsidiary ReCreation Marketing acquired a distributor with a strong presence in British Columbia, which would serve as a platform to expand distribution of TPB's cannabis products in Canada. *Id.* ¶ 55. In July 2021, TPB increased its investment in ReCreation Marketing, now known as Turning Point Brands Canada. *Id.* ¶ 56. TPB has thus simultaneously invested in Docklight and Turning Point Brands Canada, with the intention of increasing TPB's presence in the Canadian cannabis market and expanding the reach of the Marley products throughout North America. *Id.* ¶ 58. In violation of High Park's right of

first offer, Docklight has not kept High Park apprised of its negotiations with TPB, presented

High Park with a term sheet, or given High Park a right of first offer with respect to any of

Docklight's transactions with TPB. *Id.* ¶ 59; Dkt. 19, Ex. A § 1.6.

## LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, the court must construe the complaint in the light

most favorable to the non-moving party. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416

F.3d 940, 946 (9th Cir. 2005). The court must accept all well-pleaded facts as true and draw all

reasonable inferences in favor of the non-movant. *Wyler Summit P'ship v. Turner Broad. Sys.,*

*Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). A claim will survive dismissal "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).

Under Rule 9(b), an allegation of fraud must be "specific enough to give defendants

notice of the particular misconduct … so that they can defend against the charge." *Vess v. Ciba-*

*Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). "Malice, intent, knowledge, and other

conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## JUDICIAL NOTICE

Although courts generally "may not consider material outside the pleadings when ruling

on a Rule 12(b)(6) motion, … there are two exceptions: (1) courts may rely on documents

outside the pleadings if their 'authenticity … is not contested and the plaintiff's complaint

necessarily relies on them;' and (2) 'a court may take judicial notice of matters of public

record.'" *Porter v. Lear*, 2021 WL 6754524, at *1 (E.D. Wash. Sept. 24, 2021) (quoting *Lee v.*

*City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001)). Such "matters of public record"

include "public records of governmental entities and authoritative sources of foreign law,

including information posted on government websites." *Gallagher v. Philipps*, 2021 WL 4428996, at *7 (S.D. Cal. Sept. 27, 2021) (collecting cases); *see* Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source ...."); Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). "Judicial notice is mandatory if 'a party requests it and the court is supplied with the necessary information.'" *In re Yahoo! Inc. S'holder Derivative Litig.*, 153 F. Supp. 3d 1107, 1117 (N.D. Cal. 2015) (quoting Fed. R. Evid. 201(c)).

Based on the foregoing, the Court takes judicial notice of the following:

1. Public records, such as a Securities and Exchange Commission 10-Q Report filed by Turning Point Brands, Inc. Dkt. 20, Ex. A.

2. Authoritative sources of foreign law, including (1) excerpts from Canada's Cannabis Act (S.C. 2018, c. 16), obtained from the full text of the Cannabis Act publicly available at the Government of Canada's Justice Laws Website, (S.C. 2018, c. 16, https://laws-lois.justice.gc.ca/PDF/C-24.5.pdf), the official online source of the consolidated Acts and regulations of Canada; and (2) publicly available information from the Government of Canada concerning the regulation of CBD in Canada obtained from the official website of the Government of Canada ("Cannabidiol (CBD)," GOVERNMENT OF CANADA July 30, 2020), https://www.canada.ca/en/health-canada/services/drugs-medication/cannabis/about /cannabidiol.html.) Dkt. 26, Exs. A and B.

3. A screenshot from Defendant Tilray's website, taken on April 13, 2022, https://www.tilray.com/home/#management. Dkt. 29, Ex. A. *See Woodhouse v. United States*, 2021 WL 6333468, *3 (C.D. Cal. Nov. 24, 2021) (taking judicial notice of the contents of a party's website) citing *Arroyo v. AJU Hotel Silicon Valley LLC*, 2021 WL 2350813, at *2 (N.D. Cal. Mar. 16, 2021).

## DISCUSSION

A.    Fraud, Fraudulent Inducement, Negligent Misrepresentation

Defendants allege that Docklight's agreement to grant High Park a right to terminate for

1    convenience was fraudulent because, at the time the parties executed the First Amendment,

2    Docklight knew of the upcoming Merger, planned to threaten to use its own right of termination

3    to force incoming new management to relinquish High Park's right to terminate for convenience

4    (after first securing High Park's payment of CAD $1.5 million). In short, Defendants allege that

5    Docklight made a contractual promise that it never intended to perform.

6            To state a claim for fraudulent misrepresentation, Defendants must plausibly allege the

7    following: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) Docklight's

8    knowledge of its falsity; (5) Docklight's intent that it should be acted upon by Defendants; (6)

9    Defendants' ignorance of its falsity; (7) Defendants' reliance on the truth of the representation;

10   (8) Defendants' right to rely upon it; and (9) damages suffered by Defendants. *Stiley v. Block*,

11   130 Wn.2d 486, 505 (1996).

12           To state a claim for negligent misrepresentation, Defendants must plausibly allege: (1)

13   Docklight supplied false information for the guidance of Defendants in their business

14   transactions; (2) Docklight knew or should have known that the information was supplied to

15   guide Defendants in their business transactions, (3) Docklight was negligent in obtaining or

16   communicating the false information, (4) Defendants relied on the false information, (5)

17   Defendants' reliance was reasonable, and (6) the false information proximately caused

18   Defendants' damages. *Ross v. Kirner*, 162 Wn.2d 493, 499 (2007).

19           Claims for fraud and fraudulent inducement must be alleged "with particularity" and

20   must set forth "the who, what, when, where, and how" of the misconduct charged. *See Cooper v.

21   Pickett*, 137 F.3d 616, 627 (9th Cir.1997) (internal quotation marks omitted); Fed. R .Civ. P.

22   9(b). Further, to survive a motion to dismiss under Rule 12(b)(6), a defendant must plead

23   "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). It is not sufficient that defendants allege facts that are "merely consistent with" their assertion of liability, because such facts do not support a plausible inference of liability. *In re Century Aluminum Co. Securities Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).

Docklight argues that this claim fails because Defendants failed to allege a duty to disclose, Defendants ratified and affirmed the First Amendment when they entered the Second Amendment, Defendants disclaimed any implicit understanding or waiver, and Defendants had ample opportunity to negotiate for the waiver.

The parties agree that, on December 3, 2020, Docklight and High Park entered the First Amendment to, among other things, grant High Park a right to terminate the License without cause, in exchange for which High Park paid a nonrefundable CAD $1.5 million fee. Dkt. 15 ¶ 33. They also agree that, on April 30, 2021, Docklight and High Park negotiated another amendment to the License (the Second Amendment), to reflect High Park's agreement to give up the termination right it had been granted in the First Amendment, in exchange for Docklight's agreement not to exercise its own termination right in connection with the Merger. *Id.* ¶¶ 44, 45.

However, Defendants allege that prior to the First Amendment, Docklight: (1) knew that Old Tilray and Aphria were "in discussions" to merge in the future; (2) knew that Merger would result in Old Tilray having "new management"; (3) knew the Merger would trigger Docklight's right to terminate the License; and (4) Docklight had an undisclosed plan to use its termination

1  right as leverage after the Merger was announced to convince High Park to surrender the

2  termination right it had secured under the First Amendment (all while retaining the CAD $1.5

3  million non-refundable payment). Dkt. 15 ¶ 79. These allegations are based on the facts that

4  Brendan Kennedy: (1) was both the CEO of Tilray and a significant investor in and owner of

5  Docklight; (2) is close friends with Docklight officers Michael Blue and Christian Groh; (3)

6  maintained shared office space with Blue and Groh and times during 2020, and with Blue as of

7  December 2020; and (4) shared details of the Merger negotiations with Docklight officers. *Id*. ¶¶

8  6-7, 21, 23-24.

9           1.    Duty to Disclose

10          Docklight argues that Tilray has failed to state a claim of fraudulent or negligent

11  nondisclosure because it has failed to allege Docklight had a duty to disclose. A key element for

12  claims of fraudulent or negligent nondisclosure is a duty on the part of the party charged to

13  disclose the information. *Baker Boyer Nat'l Bank v. Foust*, 6 Wn. App.2d 375, 381 (2018) (it is

14  only "[w]hen a duty to disclose exists" that "the suppression of a material fact is tantamount to

15  an affirmative misrepresentation" and can support a claim for fraud) (quoting *Crisman v.*

16  *Crisman*, 85 Wn. App. 15, 22, 931 P.2d 163 (1997)).

17          Defendants counter that they need not plead any special facts giving rise to a duty to

18  disclose because their theory is based on an affirmative representation, *i.e.*, that Docklight

19  promised that, upon payment of CAD $1.5 million, High Park would have the right to terminate

20  for convenience. As pled, that promise was "made for the purpose of deceiving and with no

21  intention of performing," and is therefore "actionable" as an affirmative misrepresentation.

22  *Sprague v. Sumitomo Forestry Co*., 104 Wash.2d 751, 762 (1985) (en banc); *see Gardner v.*

23  *Frederick*, 96 Wash. 324, 326 (1917) (noting "general rule" that fraud may be premised on "an

REPORT AND RECOMMENDATION - 14

intention at the time of making [a contractual promise] not to perform").

Defendants admit that High Park purchased the right to terminate the License in exchange for the cash payment as a termination for convenience explicitly excused High Park from any further GMR obligations. Dkt. 15, ¶¶ 33, 34. High Park does not allege that it ever evoked its right to terminate or that Docklight ever resisted any such invocation. High Park enjoyed the right to terminate for convenience for five months until the parties negotiated to remove it in the Second Amendment. Dkt. 15 ¶¶ 27, 33, 45. The parties began to negotiate the terms of the Second Amendment after High Park's counsel asked Docklight to waive its right to terminate the License based on any change of control related to the Merger. Dkt. 15, ¶ 38.

Defendants now argue that after conferring the right to terminate and after the Merger was announced, Docklight rendered the right "illusory" by negotiating to secure High Park's agreement to surrender it on April 30, 2021, in exchange for Docklight's approval of the Merger. Dkt. 25 at 14; Dkt. 15 ¶ 73. However, a promise is not fraudulent merely because it is illusory. Rather, to say a promise is illusory is merely to say it fails as consideration. *SAK & Associates, Inc. v. Ferguson Const., Inc.*, 189 Wn. App. 405, 411-12 (2015). Moreover, a promise is not "illusory" unless "the provisions of [the] agreement leave the promisor's performance entirely within his discretion and control" such that "there is an absolute right not to perform at all." *Id.*

Here, there is no dispute that Docklight was bound by High Park's termination right for the five-month period between the executions of the First and Second Amendments. Moreover, if Docklight had absolute discretion to deny High Park the termination right, Docklight would have had no need to negotiate and give consideration for High Park's surrender of that right. *See* Dkt. 15 ¶¶ 39-45.

REPORT AND RECOMMENDATION - 15

1

2.    <u>Ratification/Affirmation of the First Amendment</u>

2

Docklight next argues that High Park "ratified and affirmed" the First Amendment when

3

it entered the Second Amendment because it was aware at that time of all facts relevant to the

4

alleged fraudulent inducement of the First Amendment. Dkt. 18, pp. 9-10. And, even without the

5

explicit ratification, Docklight argues that High Park is prohibited from entering a subsequent

6

contract pertaining to the same subject matter as an earlier one, and then nine months later claim

7

it was fraudulently induced to enter the first contract. *Burton Way Hotels Ltd. v. Four Seasons*

8

*Hotels, Ltd.*, 683 F. Appx 567, 570 (9th Cir. 2016).

9

Defendants do not dispute that at the time High Park entered the Second Amendment, it

10

was aware of all facts relevant to the alleged fraudulent inducement of the First Amendment.

11

Rather, Defendants argue that it could not have ratified the First Amendment with the Second

12

Amendment because both were based on fraud and at the time it ratified the First Amendment, it

13

was under the *defacto* control of Aprhira: "[I]ncoming Aphria management was (and was known

14

by Docklight to be the ultimate decision-maker in entering the Second Amendment." Dkt. 15 ¶¶

15

80-81. Defendants argue further that is no indication that incoming Aphria management was

16

aware of all facts relevant to the fraud at the time of the Second Amendment; and the Second

17

Amendment became effective "only … upon the closing" of the Merger (Dkt. 19, Ex. C § 3(a)),

18

when Tilray's new management assumed control.

19

First, Docklight correctly points out that if Aphria management controlled High Park

20

such that High Park was its passive agent in agreeing to the Second Amendment, the law of

21

agency (and equity) demand that High Park's knowledge at the time be imputed to Aphria

22

management. *See Reverse Now VII, LLC v. Oregon Mutual Insurance Company*, 341 F. Supp. 3d

23

1233, 1239 (W.D. Wash. 2018) ("it is well-settled that an agent's knowledge is imputed to his

1    principal") (citing Restatement (Third) of Agency § 5.03 (2006)).

2           Second, Defendants have failed to adequately plead Docklight's alleged fraudulent plan.

3    Fraud claims made on information and belief "are not usually sufficiently particular, unless they

4    accompany a statement of facts on which the belief is founded." *Shroyer v. New Cingular*

5    *Wireless Servs., Inc.*, 622 F.3d 1035, 1042 (9th Cir. 2010). Here, Defendants have plead only that

6    at the time of the First Amendment, Brendan Kennedy, CEO of Old Tilray and a Docklight

7    shareholder, shared office space and on one occasion "shared details of the [Merger] negotiations

8    with two of Docklight's directors. Dkt. 25 at 17. From this, Defendants ask that the Court infer

9    that: (1) prior to the First Amendment, Mr. Kennedy told these directors about the upcoming

10   management change; (2) the directors told Docklight's management; and therefore (3) Docklight

11   planned all along to negotiate High Park's surrender of its termination right. Even assuming the

12   first two inferences are plausible, Defendants fail to explain how Docklight's knowledge that

13   future events may present an opportunity to renegotiate a term makes the original promise

14   fraudulent. Additionally, Defendants do not specifically allege Mr. Kennedy informed Docklight

15   of the upcoming management change even though Mr. Kennedy sits on Defendants' own board

16   of directors and can confirm or refute the inference Defendants ask the Court to draw here.

17          Third, fraud claims require "first party reliance," that is, the one who relied must be the

18   one who was injured. *Stiley v. Block*, 130 Wn.2d 486, 505 (1996). Defendants allege Docklight

19   falsely represented that it previously agreed to give High Park the termination right "in large part

20   because of [Docklight's] trust and close relationship with the [Old] Tilray management team."

21   Dkt. 15 ¶ 40. Defendants confirm that their allegation is that *Aphria management* relied on this

22   statement in causing High Park to enter the Second Amendment. However, Defendants do not

23   provide any articulated or factually supported logical link between Docklight's "trust" in Old

1   Tilray and *Aphria management's* alleged decision to cause the Second Amendment to be

2   executed.

3         Defendants argue that "there is no general common-law principle holding that a

4   fraudulent misrepresentation can cause legal injury only to those who rely on it." Dkt. 25 at 19

5   (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 656 (2008)). However, *Bridge*

6   states only that a non-first party injured by a fraudulent statement may have some claim for

7   "legal injury" – it does not state that common-law fraud can be established without showing

8   first-party reliance. 553 U.S. at 656 n.7 ("The cases are not cited as evidence that common-law

9   fraud can be established without showing first-party reliance.").

10         Fourth, Defendants have not adequately alleged falsity with Docklight's statement.

11   Defendants insist they adequately alleged falsity with respect to Docklight's statement

12   because they alleged Docklight was aware of the upcoming management change when it entered

13   the First Amendment. Dkt. 25 at 19. But they fail to explain how that alleged awareness supports

14   a plausible inference that its subsequent statement(s) was false. A fraud claim may not be

15   grounded on a factual allegation that, at most, vaguely and tenuously suggests that fraud might

16   be one of any number of explanations of the events at issue. *See In re Century Aluminum Co.*

17   *Securities Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (it is not sufficient that defendants allege

18   facts that are "merely consistent with" their assertion of liability, because such facts do not

19   support a plausible inference of liability) (quoting *Iqbal*, 556 U.S. at 678).

20         Defendants also vaguely assert that "the pre-existing transactions were related-party

21   transactions and old management was conflicted." Dkt. 25 at 20 (citing Dkt. 15 (Amended

22   Counterclaims) ¶¶ 81, 93, 106, 126). The Court is unable to fully evaluate this statement as

23   Defendants have failed to provide enough detail. *See, e.g.*, *Delashaw v. Seattle Times Company*,

2018 WL 4027078, at *14 (W.D. Wash. Aug. 23, 2018) ("The court declines to address that cursory argument, however, because Dr. Cobbs does not provide enough detail to allow the court to fully evaluate it.") (citations omitted).

Fifth, Defendants do not adequately allege Docklight's knowledge. The only facts on which Defendants base their allegation—that Docklight was aware of the de-listings before the Second Amendment—are: (1) "de-listings are based on sales volume, and the royalties that Docklight received were also based on sales volume"; and (2) Mr. Kennedy was a Docklight shareholder and was friends and shared office space with two Docklight directors. Dkt. 25 at 21. As to the first, there is no allegation Docklight received royalty payments in real-time nor does it allege how the sales volume was altered. As to the second, the inference that Mr. Kennedy shared this information with Docklight is pure speculation. In averments of fraud, the circumstances must be stated with particularity. Additionally, if Defendants are inferring that Mr. Kennedy withheld information from Aphria management about the de-listings prior to the Merger, then it appears that Defendant Tilray's injuries were allegedly suffered due to the actions of its own board member, who was and is a member of the Board of Directors of New Tilray.

Defendants also concede that there was no "special relationship" between Docklight and Aphria but argue that Docklight had a duty to disclose information to Aprhia because Docklight made statements to Aphria management that the Licensed Products "were performing well, and that the merged Tilray-Aphria could build on that success." Dkt. 25 at 21. However, the Second Amendment was only between Docklight and High Park. Defendants allege no facts to support the bare allegation that Docklight made these statements "in order to guide the business dealings of" Aphria management (as opposed to High Park), and "had reason to know" Aphria

1 management (as opposed to High Park) would rely on those statements. Defendants also fail to

2 allege which "business dealings" Docklight knew it was "guiding." Defendants have failed here

3 again to state with particularity, the circumstances constituting the alleged fraud.

4        3.     Access to the Product De-Listing Information

5      A fraudulent non-disclosure claim fails where the plaintiff "had access to the same or

6 similar information" as the defendant but "did not have the time or inclination to undertake a

7 complete examination" of the facts before signing the contract. *Rincon Center Associates v.*

8 *Chrysler MacNally Corp.*, 1998 WL 410886, at *6 (N.D. Cal. July 16, 1998); *see also*

9 (Restatement (Second) of Torts § 551 cmt. k (Am. Law Inst. 1977) (same).

10      Docklight contends that the then-Aphria management could not have relied on Docklight

11 for accurate information about product performance because, Aphria management must have had

12 access to that information. In response, Defendants contend that this is a question of fact

13 inappropriate for resolution on a motion to dismiss because Defendants adequately alleged that

14 (1) incoming management did not know about the de-listings, (2) Docklight directed its

15 misleading partial statements at this incoming management, and (3) Docklight knew this

16 management was relying on Docklight's representations and omissions. Dkt. 15 ¶¶ 81-85.

17      Defendants have failed to plead with sufficient particularity, however, how it is that

18 Apria Management did not know and/or could not have easily discovered what High Park knew

19 regarding the de-listing information that was allegedly critically important to High Park in

20 executing the Second Amendment as High Park contends that Apria management totally

21 controlled High Park with respect to its execution of the Second Amendment.

22        4.     Docklight's Threat to Exercise its Right to Terminate

23      Defendants allege fraud and negligent misrepresentation based on Docklight's statement,

1   prior to entering the Second Amendment, that Docklight would exercise its right to terminate

2   upon change of control unless High Park relinquished its right to terminate for convenience. Dkt.

3   15 ¶¶ 74-109. Defendants contend that this statement was false because Docklight knew about

4   the Merger before it entered the First Amendment, accepted High Park's payment of CAD $1.5

5   million and thereby, ratified the First Amendment and waived any right it might otherwise have

6   had. *Id*. ¶ 84.

7        However, a mere threat to walk away from a negotiation, even if "false," is not fraud.

8   *Keasler v. Natural Gas Pipeline Co*., 569 F. Supp. 1180, 1187 (E.D. Tex. 1983). Defendants

9   argue that "misrepresentation of a speaker's state of mind satisfies the 'existing fact'

10  requirement." Dkt. 25 at 23. But the authorities they cite involve promissory fraud, where the

11  speaker falsely represented an intent to do something for the benefit of the other party; and failed

12  to do it. *See Beckendorf v. Beckendorf*, 76 Wn.2d 457, 463 (1969); *Ritchie Bros. Auctioneers Inc.*

13  *v. Naem Suid*, 2018 WL 1811353, at *5 (W.D. Wash. Apr. 17, 2018). Defendants cite no

14  authority for the proposition that a fraud claim lies where the speaker threatens to exercise its

15  right to terminate, but then fails to do it. Even assuming Docklight knew about the potential

16  Merger when it entered the First Amendment on December 3, 2020, this knowledge does not

17  support a plausible inference that it would not have exercised its termination right nearly five

18  months later. Moreover, the information on which Defendants now allege this fraudulent

19  inducement theory was in their possession in early 2021, *before* they requested that Docklight

20  explicitly waive its termination right.

21       Based on the foregoing, the undersigned recommends that Docklight's motion to dismiss

22  Defendants' counterclaims for fraud, fraudulent inducement, and/or negligent misrepresentation

23  be **granted**.

1  B.    Unjust Enrichment

2         Defendants allege that both the First and Second Amendments are invalid. They claim the

3  First Amendment is invalid because Docklight never intended to honor the promise (High Park's

4  right to terminate for convenience) and the Second Amendment lack consideration because

5  Docklight knew about the Merger negotiations when it executed the First Amendment and when

6  it accepted High Park's payment for the right to terminate for convenience. Defendants allege

7  that Docklight did not give consideration for the relinquishment of its right to terminate due to a

8  change in control because it knew all along that the change in control was coming. Thus,

9  Defendants argue that by keeping High Park's payment of CAD $1.5 million and retaining the

10  GMR provision, Docklight was unjustly enriched. Dkt. 15 ¶¶ 62-68. Defendants rely on *Denton*,

11  2011 WL 3298890, at *6 for the proposition that an allegation that the contract is illusory

12  because it provided them with no benefit, is sufficient to state a claim of unjust enrichment based

13  on the existence of a written contract.

14         To prove unjust enrichment, a party must show that it conferred a benefit on the other

15  party "under such circumstances as to make it inequitable for the other party to retain the benefit

16  without payment of its value." *See Bailie Commc'ns, Ltd. v. Trend Bus. Sys. Inc.*, 61 Wash.App.

17  151, 159–60, 810 P.2d 12 (1991). The elements of an unjust enrichment claim in Washington

18  are: (a) a benefit conferred on defendant by the plaintiff; (b) appreciation or knowledge of the

19  benefit; and (c) that retention of the benefit would be unjust under the circumstances. *Id*. at 160,

20  810 P.2d 12. Unjust enrichment is a theory of recovery based on implied contract, and in

21  Washington "[t]he courts will not allow a claim for unjust enrichment in contravention of a

22  provision in a valid express contract." *Associated Gen. Contractors of Am., Inc. v. State*, 10 Wn.

23  App. 406, 518 P.2d 212 (1974); *see also MacDonald v. Hayner*, 43 Wn. App. 81, 85-86 (1986)

1  ("A party to a valid express contract is bound by the provisions of that contract and may not

2  disregard the same and bring an action on an implied contract relating to the same matter, in

3  contravention of the express contract.") (citations omitted); *Swartz v. Deutsche Bank*, 2008 WL

4  1968948 at *25 (W.D. Wash. May 2, 2008) (same).

5      Because Defendants fail to plead grounds of fraud sufficient to invalidate the First

6  Amendment, they cannot bring a claim for unjust enrichment. As discussed previously, High

7  Park's January 2021 request for an explicit waiver belies its belief that Docklight had implicitly

8  waived its termination right in December 2020, as does the parties' subsequent negotiation over

9  the terms under which Docklight would provide that express waiver. After requesting that

10  explicit waiver and after negotiating with Docklight to secure it, High Park "ratified and

11  confirmed" the First Amendment and agreed that any prior representations from Docklight

12  concerning its termination right were "superseded" by the Second Amendment. Dkt. 19, Moen

13  Decl., Ex. C.

14      Defendants' demand that Docklight pay back that money under a theory of implied

15  contract fails, because it contradicts the express term requiring High Park to pay it in exchange

16  for the termination right and other consideration. *MacDonald v. Hayner*, 43 Wn. App. 81, 85-86

17  (1986). Defendants' argument that the termination right it received in exchange for the CAD

18  $1.5 million was illusory, fails for the reasons discussed above. Defendants allege that the

19  Second Amendment lacked consideration but do not explain the relevance of this allegation as it

20  is undisputed that the CAD $1.5 million was paid under the First Amendment. Finally,

21  Defendants cannot claim Docklight was unjustly enriched by the payment under the First

22  Amendment when, months later, they ratified the First Amendment, knowing all the facts on

23  which their claim is based.

Based on the foregoing, the Court recommends that Docklight's motion to dismiss Defendants' counterclaim of unjust enrichment be **granted**.

C.    <u>Rescission</u>

To the extent Defendants' rescission claim is based on the allegation that the Second Amendment was procured by fraud, the Court finds that it fails because Defendants have failed to adequately allege fraud.

Defendants also contend that the Second Amendment is void for lack of consideration because: (1) Docklight implicitly agreed, in the First Amendment, it would not invoke its termination right with respect to the potential Merger; and therefore (2) when it explicitly waived termination once the Merger was announced, in exchange for High Park surrendering its termination right in the Second Amendment, it was not giving anything new of value.

Defendants are estopped from making this argument. "Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Townsend v. Quadrant Corp.*, 173 Wn.2d 451, 461 (2012). It is undisputed that, for nine months after the Second Amendment was executed, Defendants continued to receive the benefits of that amendment, including the continuation of the License despite the Merger and the continued use of the Marley brand to earn revenues on Licensed Products.

Further, equity recognizes that "a party should not be allowed to disavow a representation made to another party if that other party would be injured by reliance on the representation." *Crown Plaza Corp. v. Synapse Software Sys., Inc.*, 87 Wn. App. 495, 502, 962 P.2d 824 (1997). When it entered the Second Amendment, High Park represented it was doing so "for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged." Dkt. 13

REPORT AND RECOMMENDATION - 24

1  at 40. When it made that representation, it was aware of all the facts on which it now premises its

2  "lack of consideration" argument.

3          Defendants cite *Kellar v. Estate of Kellar*, 172 Wn. App. 562, 584 (2012), for the

4  proposition that "a contract that is void at its inception, as opposed to merely voidable, is an

5  absolute nullity and is incapable of ratification." But Defendants' conduct demonstrates they do

6  not consider the License void "at its inception," because they bring counterclaims seeking to

7  enforce rights they claim thereunder. *See*, *e.g.*, Dkt. 15 at 40-41 (claim for breach of good faith

8  and fair dealing, breach of provision requiring annual review of royalties, and breach of right of

9  first refusal). Further, Defendants do not dispute that a party waives the defense of fraudulent

10  inducement by receiving benefits under a contract. Dkt. 18 at 20. Finally, when High Park

11  executed the First Amendment, it disclaimed reliance on any implicit understandings or

12  promises. Dkt. 18 at 11.

13          Based on the foregoing, the Court recommends that Docklight's motion to dismiss

14  Defendants' counterclaim of recission be **granted**.

15  D.      Good Faith and Fair Dealing

16          Defendants allege that Docklight breached the duty of good faith by: (1) depriving High

17  Park of the benefit of the right to terminate the License for convenience; and (2) terminating the

18  License to avoid an annual review of the GMR. Dkt. 15 ¶¶ 120-34.

19          "Under Washington law, there is in every contract an implied duty of good faith and fair

20  dealing that obligates the parties to cooperate with each other so that each may obtain the full

21  benefit of performance." *Rekhter v. Dep't of Social and Health Servs*., 180 Wn.2d 102, 112-13

22  (2014) (internal quotation marks and citations omitted). The duty of good faith arises in the

23  performance of specific contractual obligations. *Johnson v. Yousoofian*, 84 Wn. App. 755, 762

(1996). Breach of a specific provision of the contract is not a necessary prerequisite to a breach of good faith and fair dealing claim. *Id.* at 111-112. Instead, the duty of good faith "obligates the parties to cooperate so that each may obtain the full benefit of performance." *Lucero v. Cenlar FSB*, 2016 WL 337221, at *6 (W.D. Wash. Jan. 28, 2016). As noted in *Lucero*:

> "The duty varies somewhat with the context in which it arises. See Restatement (Second) of Contracts § 205, cmt. d. It may violate the duty of good faith and fair dealing to, for example, (1) evade the spirit of a bargain; (2) willfully render imperfect performance; (3) interfere with or fail to cooperate in the other party's performance; (4) abuse discretion granted under the contract; or (5) perform the contract without diligence. *Id.*" *Microsoft Corp. v. Motorola, Inc.*, 963 F. Supp.2d 1176, 1184 (W.D. Wash. 2013) (internal footnote omitted).

*Lucero*, 2016 WL 337221 at *6 n.6.

Defendants allege Docklight acted in bad faith with respect to the License in two ways. First, by granting the right to terminate to High Park in the First Amendment and accepting High Park's payment of CAD $1.5 million in exchange for the right, when Docklight knew about the Merger and intended to use the Merger to cause High Park to forfeit its right and its payment shortly thereafter. Second, by refusing to review the royalty rates (including GMR) to ensure they reflect the value of the License and terminating the License a mere five days before the contractual deadline for completion of such review. Defendants argue this is particularly pertinent as they had already raised this contractual provision in their counterclaims weeks prior to Docklights' termination, and Docklight is nevertheless seeking as damages post-termination GMR for the full term that the License would have lasted if Docklight had not chosen to terminate.

Docklight counters that as to the first ground – *i.e.*, the alleged scheme to grant and then take back High Park's termination right, High Park has cited no authority for the odd proposition that a party to negotiations has a duty to disclose a plan to later negotiate for additional changes

1    to the contract. As to the second ground – *i.e.*, refusal to discuss changes to the GMR and

2    terminating the License before the deadline for the Annual Royalty Review, Docklight argues

3    that the express terms of the contract allowed it to exercise its right to terminate for cause before

4    that deadline.

5    　　　　For the reasons discussed below, the Court recommends **denial** of Docklight's motion to

6    dismiss Defendants' counterclaims for breach of contract based on Docklight's alleged violation

7    of the right of first offer provision ("ROFO") and for anticipatory breach. For these reasons, the

8    Court also recommends **denial** of Docklight's motion to dismiss Defendants' counterclaim for

9    the breach of good faith and fair dealing.

10    E.    Defendants Have Sufficiently Plead Breach of Contract Based on the ROFO

11    　　　　The parties agreed in the First Amendment to a right of first offer provision ("ROFO")

12    stating in relevant part that: "[Docklight] agrees in good faith to keep [High Park] apprised of its

13    efforts to license the Licensed Property on, for or in connection with the manufacture, sale,

14    distribution, marketing, advertising and other related activities for Cannabis Products that are not

15    Licensed Products ('Other Cannabis Products') in the Territory." Dkt. 19, Ex. B § 2(g). The

16    License Agreement provides that Docklight must "discuss in good faith [with High Park] the

17    opportunity for license of Other Cannabis Products," and provide High Park with a "summary

18    term sheet" and the opportunity to "match the terms of any such proposed license." *Id.*

19    　　　　Defendants contend that Docklight breached the ROFO and alleged the following:

20    　　　　On April 20, 2021, Docklight announced that Turning Point Brands
　　　　　　("TPB") made an $8.7 million strategic investment in Docklight, and that this
21    　　　　investment granted TPB an exclusive right to distribute certain Marley-branded
　　　　　　products in the U.S. and unspecified follow-on rights. Dkt. 15, ¶ 52. Also in April
22    　　　　2021, TPB subsidiary ReCreation Marketing acquired a distributor with a strong
　　　　　　presence in British Columbia, which would serve as a platform to expand
　　　　　　distribution of TPB's cannabis products in Canada. *Id.* ¶ 55. In July 2021, TPB
23    　　　　increased its investment in ReCreation Marketing, now known as Turning Point

Brands Canada. *Id*. ¶ 56. TPB has thus simultaneously invested in Docklight and Turning Point Brands Canada, with the intention of increasing TPB's presence in the Canadian cannabis market and expanding the reach of the Marley products throughout North America. *Id*. ¶ 58. In violation of High Park's right of first offer, Docklight has not kept High Park apprised of its negotiations with TPB, presented High Park with a term sheet, or given High Park a right of first offer with respect to any of Docklight's transactions with TPB. *Id*. ¶ 59; Dkt. 19, Ex. A § 1.6.

Docklight submits that this claim fails because Defendants have failed to plausibly allege Docklight's dealings with TPB involved an effort to license Other Cannabis Products in Canada and resulted in Docklight "signing a third-party definitive license agreement for the use of the Licensed Property" for such products. Docklight argues that Defendants have failed to allege that Docklight granted to anyone else the sort of rights to which the ROFO pertains (as its obligations to High Park were strictly limited to sales in Canada of a particular type of product, called "Other Cannabis Products," which is a defined term in the License), and also that Defendants failed to adequately allege that they would have taken advantage of this opportunity had it been presented to them.

Docklight further argues that Defendants rely only on "snippets from press releases" stating that TPB's "investment" in Docklight would "support" sales of existing Marley-branded products in Canada, but this does not give rise to a plausible inference that Docklight licensed new products to TPB or that the press release stating TPB's investment "comes with certain follow-on investment rights" implicates the licensing of new product in Canada. Docklight also argues that it could not have breached its duty to keep High Park apprised of the TPB negotiations because Mr. Kennedy (the former CEO of Tilray) assisted Docklight in these negotiations and the ROFO expired on March 3, 2021, two months before Mr. Kennedy left his CEO position.

1        Defendants have alleged that the TPB investment, as it was described by Docklight and

2    TPB in the press, is intended to "support the growth of the broader Marley CBD line … as well

3    as the Marley Natural THC products, which are produced and sold under license agreements in

4    Canada, Jamaica, and select U.S. states." Dkt. 15 ¶ 53. The press release further states:

5    "[Docklight] look[s] forward to working closely with the experienced team at Turning Point

6    Brands to drive and expand the reach of Marley products *across North America*." *Id*. ¶ 54

7    (emphasis added). TPB's CEO is quoted in the press release as stating the "goal" is "to distribute

8    these products across our vast partner network." *Id*." Dkt. 15 ¶ 53. TPB's earnings call on

9    October 26, 2021 makes clear that this network includes Canada: "We are quickly becoming a

10   one-stop shop for alternative smoking accessory products in Canada through an extensive variety

11   of third party proprietary product offerings." *Id*. ¶ 55. And TPB's network includes its

12   partnership with ReCreation Marketing (now Turning Point Brands Canada), which had the

13   stated purpose of increasing TPB's presence in Canada. *Id*. ¶ 57.

14       In the First Amendment, "Other Cannabis Products" are defined as "Cannabis Products

15   that are not Licensed Products." Dkt. 19, Ex. § 2(g). "Cannabis Product" is defined as "any

16   product that is Cannabis or a Cannabis Accessory that contains Cannabis." § 2(b). "Cannabis" is

17   defined to have "the meaning ascribed thereto in the [Canadian] Cannabis Act," and "for

18   certainty, includes any substance or mixture of substances that is derived from or contains

19   cannabis." *Id*. Under the Canadian Cannabis Act, "cannabis" is defined as "a cannabis plant and

20   anything referred to in Schedule 1 but does not include anything referred to in Schedule 2."

21   Schedule 1 refers, in pertinent part, to CBD and THC as a Schedule 1 substance. *See,* Dkt. 26,

22   High Park-Tilray Request for Judicial Notice, Ex. A.

23

Defendants' allegations, which are based on the press release issued by Docklight, support a reasonable inference that the TPB investment involved an opportunity to license Other Cannabis Products in Canada. A determination, at this stage of the litigation, of whether Marley CBD and THC products fall within "Other Cannabis Products," whether the TPB investment involved an opportunity to license Other Cannabis Products in Canada, or whether Defendants knew of the TPB investment through Mr. Kennedy's involvement in the TPB negotiations, are improper as these are questions of fact more appropriate to summary judgment.

The Court recommends that Docklight's motion to dismiss Defendants' counterclaim for breach of contract based on Docklight's alleged violation of the ROFO provision be **denied**.

F.    Defendants Have Sufficiently Alleged Anticipatory Breach

Defendants allege that the License requires the parties to review the royalty rate annually ("Royalty Rate Review"), no later than 45 days following year-end. Since mid-2021, New Tilray has informed Docklight that the GMR is not economic, and the GMR therefore does not reflect the arm's-length value of the rights granted to under the License. However, instead of conducting the Royalty Rate Review at the end of 2021, Docklight filed this lawsuit (on December 10, 2021) seeking the full GMR. Additionally, on February 9, 2022, just five days before the deadline for conducting the Royalty Rate Review, Docklight sent a notice of termination to High Park stating that it was claiming a right to "all past and future GMR payments." Dkt. 15, ¶¶ 111-114.

Defendants dispute that High Park's alleged failure to use commercially reasonable efforts in exploiting the License constitutes a valid basis for termination as High Park told Docklight the GMR was uneconomic (Dkt. 15, ¶ 31), and Docklight acknowledges that Defendants threatened to walk away from the contract unless Docklight made "concessions," (Dkt. 1-1 ¶ 4.24). Defendants further allege that they are harmed by this breach because

Docklight explicitly seeks to recover the full GMR as damages on a going-forward basis, even though Docklight refused to perform the Royalty Rate Review and/or reevaluate the value of the License but instead terminated the License such that there are no actual royalties against which the GMR could be an "advance."

Docklight argues that it is illogical to claim that it anticipatorily breached the License by filing suit to enforce the terms of the License as the deadline for the Royalty Rate Review did not occur until months after this lawsuit was filed. Docklight also argues that it is illogical to claim that it anticipatorily breached the License by submitting a notice of termination as that termination took effect immediately on February 9, 2022 (five days before the Royalty Rate Review deadline) and at that time, "all rights granted to Licensee … cease[d] and terminate[d]." Therefore, by the time the deadline would have arrived, Docklight had no obligation to engage in that review.

Repudiation of a contract before there has been a breach by nonperformance is called an anticipatory breach or (the more precise form) anticipatory repudiation. 2 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 8.20, at 467 (1990). Such repudiation is an express or implied assertion of intent not to perform a party's obligations under the contract prior to the time for performance. *CKP, Inc., v. GRS Constr. Co*., 63 Wash.App. 601, 620, 821 P.2d 63 (1991), *review denied*, 120 Wash.2d 1010, 841 P.2d 47 (1992). An anticipatory breach occurs when one of the parties to a bilateral contract either expressly or impliedly repudiates the contract prior to the time for performance. *Lovric v. Dunatov*, 18 Wash.App. 274, 567 P.2d 678, 683 (Wash.App.Ct.1977).

The question of anticipatory repudiation is one of fact. *CKP, Inc. v. GRS Constr. Co*., 63 Wash.App. 601, 620, 821 P.2d 63 (1991), *review denied*, 120 Wash.2d 1010, 841 P.2d 47

1   (1992). "An intent to repudiate may be expressly asserted or circumstantially manifested by

2   conduct." *CKP, Inc., 63 Wash.App*. at 620, 821 P.2d 63. However communicated, a court will

3   not infer repudiation from "doubtful and indefinite statements that performance may or may not

4   take place." *Wallace Real Estate Inv. Inc. v. Groves*, 124 Wash.2d 881, 898, 881 P.2d 1010

5   (1994). Rather, the anticipatory breach must be a clear and positive statement or action that

6   expresses an intention not to perform the contract. *Id*.

7          The court will not find that an anticipatory breach occurred based solely on the filing of a

8   complaint seeking court relief under the terms of the parties' contract. However, termination of

9   the License five days prior to Docklight's duty to perform the Royalty Rate Review in the face of

10  High Park's stated concerns, may be viewed by a trier of fact as a positive action on the part of

11  Docklight that it did not intend to perform its contractual obligation.

12         Based on the foregoing, the Court finds that Docklight's motion to dismiss Defendants'

13  Counterclaim for Anticipatory Breach should be **denied**.

14  G.    <u>Defendants' Affirmative Defenses</u>

15         Docklight moves to strike all of Defendants' affirmative defenses (except for the Eighth

16  Affirmative Defense – Statute of Limitations) to the extent they are premised on the same

17  allegations and theories challenged in this motion.

18         A motion to strike an affirmative defense is brought pursuant to Federal Rule of Civil

19  Procedure 12(f), under which a court may strike "from any pleading any insufficient defense or

20  any redundant, immaterial, impertinent or scandalous matter." The procedural sufficiency of a

21  pleaded claim or defense in federal court is governed by the federal rules.... Fed.R.Civ.P. 8(c)

22  determines whether the pleading of the ... defense was sufficient ... The key to determining the

23  sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the

defense. *Wyshak v. City National Bank*, 607 F.2d 824, 827 (9th Cir.1979). In all averments of fraud, including affirmative defenses, the circumstances constituting the fraud must be stated with particularity. *Multimedia Patent Trust v. Microsoft Corp.*, 525 F. Supp.2d 1200, 1210–1211 (S.D.Cal.2007).

If a claim is stricken, leave to amend should be freely given when doing so would not cause prejudice to the opposing party. *Wyshak*, 607 F.2d at 826.

1.    First Affirmative Defense – Failure to State a Claim

In support of their First Affirmative Defense, Defendants contend that Plaintiff's Amended Complaint must be dismissed because Plaintiff has failed to state a claim on which relief may be granted, due to Plaintiff's own failure to perform under the High Park License, and due to lack of reliance. Dkt. 15, ¶ 7.

The Court concludes that this affirmative defense should be dismissed, with leave to amend, based on Defendants' failure to plead facts sufficient to place Docklight on notice of the basis of this affirmative defense. Defendants fail to plead facts to explain how Plaintiff "failed to perform" and what is meant by "due to lack of reliance."

2.    Second Affirmative Defense – Unclean Hands, Estoppel, Laches, Ratification and Waiver

In support of their Second Affirmative Defense, Defendants contend that Plaintiff's claims are barred by the equitable doctrines of unclean hands, estoppel, laches, ratification, and waiver, because Docklight knowingly entered the First Amendment granting High Park a right to terminate for convenience, and knowingly accepted High Park's CAD 1.5 million payment, and an insertion of a guaranteed minimum royalty ("GMR"), despite having no intention of honoring its promise to High Park of a right to terminate for convenience. Further, Docklight entered the First Amendment knowing of the upcoming de-listings, knowing of the upcoming Tilray-Aphria

merger, and with the intention of using the Tilray-Aphria merger to threaten a termination for change of control and force High Park to forfeit its CAD 1.5 million payment and its right to terminate for convenience, while allowing Docklight to retain the GMR. Docklight never intended to terminate for change-of-control based on the Tilray-Aphria merger; indeed it was aware of these facts when it entered into and accepted payment for the First Amendment. Docklight's intention was to induce High Park to relinquish its right to terminate for convenience. Dkt. 15, ¶¶ 8-10.

This affirmative defense is premised on the same factual allegations and legal theories as Defendants' counterclaims for fraud, fraudulent inducement, negligent misrepresentation, unjust enrichment, and rescission. The undersigned has recommended that those counterclaims be dismissed. Accordingly, this affirmative defense should also be dismissed.

3.    Third Affirmative Defense – Unjust Enrichment

In support of their Third Affirmative Defense, Defendants contend that Plaintiff's claims are barred by the doctrine of unjust enrichment, because Docklight's promises in the First Amendment in exchange for the GMR and CAD 1.5 million were illusory and do not constitute sufficient consideration for the First Amendment, and because Docklight's purported April 30, 2021 waiver of any right to terminate the High Park License does not constitute sufficient consideration for the Second Amendment to the High Park License. Docklight was therefore unjustly enriched by High Park's CAD 1.5 million payment and High Park's forfeiture of its right to terminate the High Park License for convenience and will be unjustly enriched by any GMR payments. Dkt. 15, ¶¶ 11-12.

This affirmative defense is premised on the same factual allegations and legal theories as Defendants' counterclaims for fraud, fraudulent inducement, negligent misrepresentation, unjust

enrichment, and rescission. The undersigned has recommended that those counterclaims be dismissed. Accordingly, this affirmative defense should also be dismissed.

4.    Fourth Affirmative Defense – Unconscionability

In support of their Fourth Affirmative Defense, Defendants contend that Plaintiff's claims are barred because any award in Plaintiff's favor would be unconscionable, because Docklight knowingly entered the First Amendment granting High Park a right to terminate for convenience, and knowingly accepted High Park's CAD 1.5 million payment, and an insertion of a GMR, despite having no intention of honoring its promise to High Park of a right to terminate for convenience. Rather, Docklight entered the First Amendment knowing of the upcoming de-listings, knowing of the upcoming Tilray-Aphria merger, and with the intention of using the Tilray-Aphria merger to threaten a termination for change of control and force High Park to forfeit its CAD 1.5 million payment and its right to terminate for convenience, while allowing Docklight to retain the GMR. Docklight never intended to terminate for change-of-control based on the Tilray-Aphria merger; indeed it was aware of these facts when it entered into and accepted payment for the First Amendment. Docklight's intention was to induce High Park to relinquish its right to terminate for convenience. Dkt. 15, ¶ 13.

This affirmative defense is premised on the same factual allegations and legal theories as Defendants' counterclaims for fraud, fraudulent inducement, negligent misrepresentation, unjust enrichment, and rescission. The undersigned has recommended that those counterclaims be dismissed. Accordingly, this affirmative defense should also be dismissed.

5.    Fifth Affirmative Defense – Consent

In support of their Fifth Affirmative Defense, Defendants contend Plaintiff's claims are barred because, Docklight knowingly entered the First Amendment granting High Park a right to

terminate for convenience, and knowingly accepted High Park's CAD 1.5 million payment, and an insertion of a guaranteed minimum royalty ("GMR"), with knowledge of the Aphria-Tilray merger, thereby consenting to the merger. Dkt. 15, ¶ 14.

This affirmative defense is premised on the same factual allegations and legal theories as Defendants' counterclaims for fraud, fraudulent inducement, negligent misrepresentation, unjust enrichment, and rescission. The undersigned has recommended that those counterclaims be dismissed. Accordingly, this affirmative defense should also be dismissed.

6.    Sixth Affirmative Defense – Prior Material Breach

In support of their Sixth Affirmative Defense, Defendants contend Plaintiff's claim for breach of contract is barred because Plaintiff committed material breaches of the High Park License prior to any alleged breach by High Park and thus any performance obligations by High Park are excused by such material breaches.

The Court finds that this affirmative defense should be dismissed, with leave to amend, as Defendants have failed to sufficiently allege the circumstances of the "prior material breach."

7.    Seventh Affirmative Defense (Implied Covenant of Good Faith)

In support of their Seventh Affirmative Defense, Defendants contend Plaintiff's claim for breach of the duty of good faith and fair dealing is barred because Plaintiff violated the implied covenant of good faith and fair dealing, because Docklight (1) knowingly and in bad faith deprived High Park of the benefit of the right to terminate for convenience, for which High Park had bargained in good faith, in violation of Docklight's implied duty of good faith and fair dealing; and (2) knowingly and in bad faith purported to terminate the License Agreement in its entirety, and seek "all past and future GMR payments," without conducting the required annual review of the GMR.

1    The Court has recommended that Docklight's motion to dismiss Defendants'

2    Counterclaim for breach of the duty of good faith and fair dealing be denied to the extent it

3    relates to Defendants' claims of breach of contract (violation of the ROFO) and anticipatory

4    breach (based on Docklight's failure to perform the Annual Royalty Review). Accordingly, the

5    Court recommends that Docklight's motion to dismiss the Seventh Affirmative Defense be

6    **denied**.

7        8.    <u>Ninth Affirmative Defense – Insufficient Consideration or Lack of Mutuality</u>

8        In support of their Ninth Affirmative Defense, Defendants contend Plaintiff's claims are

9    barred due to insufficient consideration and/or lack of mutuality, because Docklight's promises

10   in the First Amendment in exchange for the GMR and CAD 1.5 million were illusory and do not

11   constitute sufficient consideration for the First Amendment, and because Docklight's purported

12   April 30, 2021 waiver of any right to terminate the High Park License does not constitute

13   sufficient consideration for the Second Amendment to the High Park License. Dkt. 18.

14       This affirmative defense is premised on the same factual allegations and legal theories as

15   Defendants' counterclaims for fraud, fraudulent inducement, negligent misrepresentation, unjust

16   enrichment, and rescission. The undersigned has recommended that those counterclaims be

17   dismissed. Accordingly, this affirmative defense should also be dismissed.

18   G.    <u>Motion to Strike Answers as "Evasive"</u>

19       In many of Defendants' responses to allegations in Docklight's Complaint relating to the

20   License, Defendants respond as follows:

21       …to the extent the allegations in paragraph [] purport to describe the license at
         issue, Defendants assert that the license is the best source of its full content and
22       context. To the extent any response is required, Defendants deny the allegations in
         paragraph [], including to the extent they do not accurately represent the license's
23       full content and context."

1    *See*, *e.g.*, Dkt. 15, ¶ 4.3.5. Docklight complains that the repeated use of the phrase "including to

2    the extent they do not accurately represent the [relevant matter's] full content and context"

3    renders the response evasive and asks that Defendants be required to unequivocally respond to

4    each allegation.

5          Federal Rule of Civil Procedure 8(b) requires that "[i]n responding to a pleading, a party

6    must: (A) state in short and plain terms its defenses to each claim asserted against it; and (B)

7    admit or deny the allegations asserted against it by an opposing party." Fed. R. Civ. P. 8(b)(1).

8    Rule 8(b)(6) states that: "An allegation – other than one relating to the amount of damages – is

9    admitted if a responsive pleading is required and the allegation is not denied." Fed. R. Civ. P.

10   8(b)(6).

11         Federal Rule of Civil Procedure 12(f) allows the Court to strike from a pleading an

12   insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. Fed. R. Civ.

13   P. 12(f). "The function of a 12(f) motion to strike is to avoid the expenditure of time and money

14   that must arise from litigating spurious issues by dispensing with those issues prior to trial."

15   *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (citation and alteration

16   omitted). Motions to strike, however, "are generally disfavored by courts because the motions

17   may be used as delaying tactics and because of the strong policy favoring resolution on the

18   merits." *Barnes v. AT & T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167,

19   1170 (N.D. Cal. 2010) (citation omitted). Such motions should only be granted if "the matter has

20   no logical connection to the controversy at issue and may prejudice one or more of the parties to

21   the suit." *New York City Employees' Ret. Sys. v. Berry*, 667 F. Supp. 2d 1121, 1128 (N.D. Cal.

22   2009). "Ultimately, whether to grant a motion to strike lies within the sound discretion of the

23   district court." *Cruz v. Bank of New York Mellon*, No. 12-CV-00846-LHK, 2012 WL 2838957, at

*2 (N.D. Cal. July 10, 2012) (citing *Whittlestone*, 618 F.3d at 973).

In each instance, Defendants first deny the allegations in the paragraph and then add the "including to the extent" language. In each such instance, the "[relevant matter]" is a specific document that Docklight purported to paraphrase or quote. In no instance was this response the only thing Defendants said in response to a numbered paragraph. In all instances, Defendants did "admit, deny, or state in good faith they can neither admit nor deny the allegation."

The Court recommends that Docklight's motion to strike Defendants' answers be **denied** as each "including to the extent" statement also expressly includes an admission or denial of the allegation. *See LumaSense Techs., Inc. v. Advanced Eng'g Servs., LLC*, 2021 WL 2953237, at *3 (N.D. Cal. July 14, 2021) (refusing to strike portion of answer that "denie[d] the allegations … 'to the extent that they are inconsistent with [the agreement]'").

## SUMMARY OF RECOMMENDATIONS

1. The Court should **grant** Docklight's motion to dismiss Defendants' Counterclaims for fraud, fraudulent inducement, unjust enrichment, and rescission (First, Second, Third, and Fourth Counterclaims).

2. The Court should **deny** Docklight's motion to dismiss Defendants' Counterclaims for the breach of good faith and fair dealing, breach of contract, and anticipatory breach (Fifth and Sixth Counterclaims).

3. The Court should **grant** Docklight's motion to dismiss Defendants' Second, Third, Fourth, Fifth, Seventh, and Eighth Affirmative Defenses.

4. The Court should **grant** Docklight's motion to dismiss Defendants' First and Sixth Affirmative Defenses but the dismissal should be with leave to amend.

5.      The Court should **deny** Docklight's motion to strike portions of Defendants' Answer.

<u>OBJECTIONS AND APPEAL</u>

This Report and Recommendation is not an appealable order. Therefore, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

Objections, however, may be filed and served upon all parties no later than **June 15, 2022**. The Clerk should note the matter for **June 17, 2022**, as ready for the District Judge's consideration if no objection is filed. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. The matter will then be ready for the Court's consideration on the date the response is due. Objections and responses shall not exceed five (5) pages. The failure to timely object may affect the right to appeal.

DATED this 27th day of May, 2022.


_____
BRIAN A. TSUCHIDA
United States Magistrate Judge

REPORT AND RECOMMENDATION - 40